## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-cr-00347 (TNM)** |
| v. | : | |
| | : | |
| ROBERT LEE PETROSH, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Robert Lee Petrosh ("Petrosh") to 120 days' imprisonment, one year of supervised release, 60 hours of community service, and $938 in restitution.

### I.      Introduction

The defendant, Robert Lee Petrosh, a former Marine, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

On January 7, 2022, Petrosh pleaded guilty to one misdemeanor count of violating 18 U.S.C. § 641: Theft of Government Property.  As explained herein, a sentence of 120 days' imprisonment is appropriate in this case because: (1) unlike most misdemeanor defendants, the defendant stole property from the United States Capitol—namely, two microphones from Speaker Pelosi's lectern—rendering him among the more culpable misdemeanor defendants arising out of

the January 6 riot; (2) the defendant deliberately positioned himself at the front of a standoff between rioters and U.S. Capitol Police ("USCP") officers inside the Crypt, and had to be warned by another rioter not to brush up against the USCP officers; (3) the defendant celebrated as rioters broke through the police line inside the Crypt; (4) the defendant told one of the vastly outnumbered officers in the Crypt, who was staring down an angry mob of rioters, to "Give us Nancy": (5) the defendant was at the front of a pack of rioters who pursued law enforcement down a hallway and into the Hall of Columns; (6) instead of exiting the building through the Hall of Columns after witnessing the clash between rioters and USCP officers inside the Crypt, the defendant decided to turn back around and rejoin the fray inside the building; (7) the defendant smoked a cigarette inside the Rotunda, one of the most hallowed rooms inside the Capitol; (8) the defendant ignored several red flags upon entering the Capitol building, including the sounds of Viking horns and exploding munitions, rioters shouting "f***ing traitors" on the west lawn, USCP officers clad in full riot gear stationed outside the Senate Parliamentarian door, rioters suffering the effects of tear gas, and shattered glass on the ground outside the Senate Wing door; (9) the defendant minimized his participation in the breach of the police line inside the Crypt in his interviews with the FBI; (10) the defendant told the FBI during a post-plea debrief that he believed that members of Congress were "lucky that's all that happened"; and (11) to this day, the defendant does not regret storming the U.S. Capitol on January 6, 2021.  To the contrary, the defendant believes that he and his fellow rioters were justified in entering the U.S. Capitol, and that any show of force short of using firearms would have been justified.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for

Petrosh's actions and those of his fellow rioters, the riot likely would have failed. Here, his participation in a riot that actually succeeded in halting the Congressional certification combined with his lack of remorse for having participated in the riot renders a 120-day jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 33 (Statement of Offense), ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Petrosh's Role in the January 6, 2021 Attack on the Capitol

At approximately 5:00 a.m. on January 6, 2021, Petrosh and a friend drove from New Jersey, to Rockville, Maryland, and caught the subway into Washington D.C. Petrosh attended the rally at the Ellipse and stayed through the conclusion of former President Trump's speech. During the rally, he noticed thousands of people leaving the rally before former President Trump finished speaking. During an April 28, 2021 interview with the FBI, Petrosh said he thought it was "weird" that "just fifteen minutes before . . . thousands and thousands of people just start peeling off and going already before he even got done talking." This mass, coordinated, early exodus from the rally led Petrosh to believe that at least "fifty percent" of the riot had been coordinated in advance.

After the conclusion of former President Trump's speech, Petrosh walked from the Ellipse to the west front of the Capitol building, where he could hear Viking horns, flashbangs, and drums.

3

He saw rioters scaling the white scaffolding that had been erected over the northwest staircase. Petrosh stood with the crowd on the west lawn as they shouted "f***ing traitors" at law enforcement.[1]  *See* Exhibit 1.[2]

Petrosh walked underneath the scaffolding, ascended the stairs to the Upper West Terrace, and began walking toward the Senate Wing Door.  On his way, he could see other rioters on the Upper West Terrace suffering the effects of tear gas.  He also passed by four U.S. Capitol Police ("USCP") officers, clad head-to-toe in black riot gear, standing guard outside the Senate Parliamentarian Door.  *See* Exhibit 2.



*Figure 1: Screenshot from a video on Petrosh's phone showing him walking past U.S. Capitol Police officers en route to the Senate Wing door.*

---

[1] It is not clear from the video on Petrosh's phone whether he personally shouted "f***ing traitors," or whether it was the rioters standing beside him.

[2] All exhibits will be provided to the Court in advance of sentencing.

All of these red flags told Petrosh to turn back.  But he did not.  Instead, Petrosh entered the Senate Wing door at 2:21 p.m., just eight minutes after rioters wielding weapons and stolen riot shields shattered the windows and climbed inside the building.  Petrosh recalls seeing broken glass and shattered windows upon entering the building.

Petrosh then made his way to the Crypt, where he participated in a standoff with USCP officers.  In interviews with the FBI, the defendant minimized his conduct inside the Crypt, claiming that he saw only five USCP officers inside the Crypt, that he never pushed or shoved any officers, and that he only "joked" to one of the officers to "Give us Nancy."  The defendant also tried to portray himself as a victim of the violence inside the Crypt, claiming that he "honestly thought [he] was going to die" from being crushed by the crowd.  Indeed, he repeatedly invoked the "Battle of the Bastards" scene from Game of Thrones—where Jon Snow is nearly crushed to death by the surrounding Bolton army—to describe the scene inside the Crypt on January 6.

What Petrosh failed to mention, however, is that he deliberately positioned himself at the front of the standoff with USCP officers inside the Crypt.  *See* Exhibit 3.  In fact, open-source video shows that Petrosh had to be warned by another rioter to stop brushing up against the USCP officers in the Crypt.  *See id.*  Further, and as depicted in the same open-source video, as rioters broke through the USCP line, the defendant pumped his fist in the air and sped toward the front of the pack. *Id.*



*Figure 2: Petrosh pumping his fist as rioters break through the police line inside the Crypt.*

Petrosh remained at the front of the pack as he continued pursuing USCP officers down a hallway toward the Hall of Columns.  *See Figure 3*.



*Figure 3: Petrosh pursuing officers down a hallway after breaching the police line in the Crypt.*

When Petrosh entered the Hall of Columns, he was once again at the front of the pack of rioters.



*Figure 4: Petrosh leading a pack of rioters inside the Hall of Columns.*

Once Petrosh realized that he had reached an exit, he turned around, walked down and back one of the hallways perpendicular to the Hall of Columns, then walked north through the Hall of Columns and back towards the Crypt.  Petrosh then ascended the staircase to the Rotunda.  Inside the Rotunda, Petrosh smoked a cigarette.  *See Figure 5.*



*Figure 5: Petrosh smoking a cigarette inside the Rotunda.*

According to Petrosh, he briefly left the Rotunda to use the restroom.  There, he claims he saw another rioter wearing a stolen necktie, which inspired him to steal his own "souvenir" from the Capitol building.  When Petrosh returned to the Rotunda from the restroom, he promptly walked up to Speaker of the House Nancy Pelosi's lectern in the center of the Rotunda and stole one of the microphones from the lectern.[3]  *See Figure 6.*  He briefly walked away, only to return to steal a second microphone from the lectern.  *See Figure 7.*

---

[3] The lectern had been moved to the center of the Rotunda by fellow rioter Adam Johnson.  *See United States v. Adam Johnson*, 1:21-cr-00648 (RBW), ECF No. 49, at 8.  Johnson was recently sentenced to 75 days' imprisonment, a one-year term of supervised release, 200 hours of community service, a $5,000 fine, and $500 in restitution for violating 18 U.S.C. § 1752(a)(1). *Id.* ECF No. 58.



*Figure 6: Petrosh steals the first microphone from Speaker Pelosi's lectern.*



*Figure 7: Petrosh steals the second microphone from Speaker Pelosi's lectern.*

Petrosh eventually sat down on one of the benches inside the Rotunda and appeared to take a phone call.  Only after being approached by an officer did Petrosh stand up from the bench and leave the Rotunda.  Petrosh eventually exited the Capitol through the East Rotunda doors at 2:51 p.m.  He spent a total of approximately thirty minutes inside the U.S. Capitol.  After exiting the building, he stood outside on the east front of the Capitol and observed the crowd of rioters singing the national anthem, banging drums, and blowing Viking horns.  *See Figure 8*.



*Figure 8. Photograph from Petrosh's phone showing rioters on the east front of the U.S. Capitol.*

When Petrosh left the Capitol, he reconnected with his friend and caught the subway back to Rockville, Maryland at approximately 5:00 p.m.

Following the riot, Petrosh texted several friends that storming the Capitol was one of the craziest things he'd ever done, and he even bragged that he had "f***ed up their house."  On January 9, 2021, he texted one of his friends, "Got your souvenir . . . Microphone from congress hall."

*Robert Petrosh's Statements to Law Enforcement*

Petrosh has twice been interviewed by law enforcement in connection with this case. Petrosh first provided a voluntary, recorded interview while FBI was executing a search warrant at his residence on April 28, 2021. Petrosh told the FBI that when he left the Capitol Building, he "didn't think it was that big of a deal . . . I mean they [Congress] are lucky that's all that happened. I mean they cheated on a f***ing election. I mean, whether you believe it or not, they did, you know they did deep down. I mean, you can't do that. . . . You think that you, you know, maybe like you're helping I guess."

When asked about his time inside the Capitol, Petrosh spoke extensively about his experience inside the Crypt. While his description of the chaos inside the Crypt was fairly accurate, he failed to mention that he had positioned himself at the front of the pack of the rioters and that he cheered as rioters pushed past the police line. He also insisted that he did not personally witness any violence against law enforcement that day, even though open-source footage shows that he witnessed a group of rioters physically break through the police line and crush USCP officers at one of the entrances to the Crypt.

When asked whether he brought any weapons with him to the Capitol on January 6, Petrosh claimed he did not, but said, "maybe if I did, like had mace or something like that, I would have brought it cause of ANTIFA and that's who I thought was going to happen."

Finally, Petrosh repeatedly voiced his belief that the 2020 Presidential Election was "stolen." He expressed frustration at the lack of any investigation into the "stolen" election, and claimed that the "stolen" election is "what fueled a lot of people." Petrosh insisted that after what happened with the 2020 Presidential Election, he would "never vote again" because his "vote don't count."

After entering his guilty plea, Petrosh participated in a proffer with law enforcement on February 14, 2022.  Petrosh reiterated his beliefs about the illegitimacy of the 2020 Presidential Election, and at some point suggested that the U.S. Capitol Building was "not a Capitol at all." When asked whether he personally regretted participating in the January 6 riot, Petrosh replied that he did not do anything wrong by entering the U.S. Capitol.  He also believed that the other rioters were justified in entering the U.S. Capitol, and would have only crossed the line had they used firearms.  Finally, Petrosh confirmed that he still has the stolen microphones at his home.

*The Charges and Plea Agreement*

On May 4, 2021, Petrosh was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2).  ECF No. 1.  He was arrested on May 4, 2021.  ECF No. 9.  On May 7, 2021, Petrosh was charged by a four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF No. 6.  A Superseding Information was filed on December 8, 2021, charging Petrosh with one additional count: misdemeanor theft of government property, in violation of 18 U.S.C. § 641.  ECF No. 27.  On January 7, 2022, Petrosh pleaded guilty to Count Five of the Superseding Information, charging him with a violation of 18 U.S.C. § 641: Theft of Government Property.  By plea agreement, Petrosh agreed to pay $938 in restitution to the Architect of the Capitol, which covers the cost of the stolen microphones.

**III.     Statutory Penalties**

Petrosh now faces sentencing on a single count of violating 18 U.S.C. § 641.  As noted in the plea agreement and by the U.S. Probation Office, Petrosh faces up to one year of imprisonment and a fine of up to $100,000.  He must also pay $938 in restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

12

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The government agrees with the Probation Office's calculation of the applicable Sentencing Guidelines range:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)(2)) | 6 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| **Total Adjusted Offense Level** | **4** |

*See* Final Presentence Investigation Report ("PSR"), ECF No. 37, ¶ 9.

The U.S. Probation Office calculated Petrosh's criminal history as category I, which is not disputed. PSR ¶ 41. Accordingly, the U.S. Probation Office calculated Petrosh's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR ¶¶ 30-38; 88. Petrosh's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation. ECF No. 32, ¶ 5.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided

by professional staff with appropriate expertise,'" and "to formulate and constantly refine

national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give

"respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States
> Sentencing Commission's in-depth research into prior sentences,
> presentence investigations, probation and parole office statistics,
> and other data. U.S.S.G. §1A1.1, intro, comment 3. More
> importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's
> on-going approval of Guidelines sentencing, through oversight of
> the Guidelines revision process. See 28 U.S.C. § 994(p)
> (providing for Congressional oversight of amendments to the
> Guidelines). Because the Guidelines reflect the collected wisdom
> of various institutions, they deserve careful consideration in each
> case. Because they have been produced at Congress's direction,
> they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable

one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that

might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and

appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As

this Court knows, the government has charged a considerable number of persons with crimes

based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be

subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that

served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

**IV.      Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this Class A misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of the government's proposed sentence of 120-day term of incarceration.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As rioters entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have

observed extensive fighting with law enforcement officials and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at Petrosh's individual conduct, we must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Petrosh personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on Petrosh's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Petrosh from most other misdemeanor defendants.   That said, having engaged in theft of government property, Petrosh is significantly more culpable than most misdemeanor defendants charged in the January 6 cases.

Petrosh encouraged and celebrated the violence of January 6.  Not only did he position himself at the front of the standoff with USCP officers inside the Crypt, but he also raised a fist and celebrates as rioters violently broke past the police line.  The defendant maintains that his statement to a USCP officer to "Give us Nancy," was a joke, but as the open-source footage shows,

16

any one of the vastly outnumbered officers inside the Crypt likely would not have perceived it as such.

It is also not a mere coincidence that the defendant found himself at the front of the pack of rioters who pursued officers down a hallway and into the Hall of Columns. The open-source footage from January 6 confirms that Petrosh was an enthusiastic and eager participant, and that he would have had to muscle his way through a dense and unruly crowd to get to the front of the crowd. *See* Exhibit 3.

Even after experiencing what he described as a near-fatal crush inside the Crypt, the defendant still had not had enough. Once he realized he had reached an exit, he decided to turn around and walk back down the Hall of Columns so that he could rejoin the action. The defendant was not deterred by the violence and danger that he witnessed inside the Crypt; rather, he wanted more.

The defendant went on to smoke a cigarette in one of the most hallowed spaces in the Capitol Building and to steal some "souvenirs" from Speaker Pelosi's lectern to commemorate the day. Petrosh did not then, and does not now, regret his participation in the January 6 riot. To the contrary, Petrosh believes that his actions were justified – that members of Congress got what they deserved on January 6, and that they should consider themselves "lucky that's all that happened" since they "cheated on a f***ing election."

Petrosh also ignored his better instincts and training in entering the Capitol Building. As a former Marine, he should have known better than to enter the building after hearing law enforcement munitions being set off, after witnessing rioters suffering the effects of tear gas, and after seeing shattered glass on the ground. Petrosh also understood what danger law enforcement was in that day; indeed, he compared it to the "Battle of the Bastards" from Game of Thrones. But

instead of defending law enforcement (or, at the very least, leaving the scene), the defendant had to be instructed by another rioter to stop brushing up against the officers inside the Crypt.

While Petrosh does not appear to use social media, his text messages in the aftermath of January 6 show that he was proud of his conduct inside the Capitol, and that he did not regret his participation. This same pride for having participated in the January 6 riot was echoed in his statements to law enforcement, when he insisted that the rioters were justified in taking over the Capitol building and that members of Congress got what they deserved.

Accordingly, the nature and the circumstances of this offense establish the clear need for a significantly deterrent sentence in this matter.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Petrosh has no criminal history. PSR ¶¶ 39-45. He served in the Marines from 1987 to 1991 and rose to the rank of Lance Corporal. *Id.* ¶ 66. He fought in Operation Desert Storm and received several awards and medals for his service. *Id.* Since 1998, Petrosh has co-owned and operated "Petrosh Big Top," a party rental business. *Id.* ¶ 71.

While Petrosh did not proactively cooperate with the government or turn himself in, he was generally forthcoming in his interviews with law enforcement. He did, however, minimize his participation in the breach of the police line inside the Crypt, suggesting to the FBI that he was more of a victim of the "crush" inside the Crypt rather than an agitator. He also maintained that he did not personally witness any violence against law enforcement, even though that is contradicted by the open-source footage from inside the Crypt. *See* Exhibit 3. Moreover, he did not express any remorse for participating in the riot on January 6. To the contrary, he still believes that he and the other rioters acted justly in storming the Capitol, and that Congress was "lucky

that's all that happened." The defendant's failure to appreciate the wrongfulness of his actions warrants a significant sentence in this case.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Petrosh's conduct and statements, both during and after the riot, demand a sentence that will deter him from future crimes.  Petrosh does not regret participating in the January 6 riot.  As evidenced by statements during his recent post-plea proffer, he still firmly believes that storming the Capitol was an appropriate response to having an election "stolen."  He does not appreciate the damage that his and other rioters' conduct caused—not just to the Capitol Building, but to our democracy writ large—and his continued belief in the righteousness of his conduct on January 6 raises significant concerns about his willingness to engage in similar conduct again in the future.  A significant sentence in this case will communicate to the defendant that violence, destruction, and theft are never appropriate responses to lost elections.

The government acknowledges that the defendant has accepted responsibility by entering into a plea agreement.  On the other hand, his failure to appreciate the collective impact of his and other rioters' actions on January 6 and his apparent lack of remorse for having stormed the Capitol underscore the need for a term of incarceration in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A probationary sentence should not necessarily become the default.[6]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 (the court should not "create the impression that probation is the automatic outcome here because it's not going to be') (statement of Judge Lamberth).

The government and the sentencing courts are making meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment.  Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration.  Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing

---

[6]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case.  *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators.  In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006).  "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences.").  In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).  *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Though no January 6 defendant has yet been sentenced for theft of government property, the government recently recommended a 120-day term of imprisonment for a defendant who stole a shard of Speaker Pelosi's wooden office sign.  *See United States v. William Merry*, 1:21-cr-00748 (JEB), ECF No. 41.  Defendant William Merry is currently scheduled to be sentenced by Judge

Boasberg on March 21, 2022.[7]  Like William Merry, the defendant also entered the Capitol less than ten minutes after the Senate Wing windows were shattered, bragged to his friends about his participation in the January 6 riot, made threatening comments about Nancy Pelosi, deliberately ignored red flags such as officers deploying munitions and tear gas, was at the front line of rioters pushing against officers, celebrated rioters overtaking police officers, and failed to express remorse for having participated in the riot.

The government has also requested, and the courts have imposed, sentences of incarceration in cases where defendants smoked marijuana inside the Capitol Building.  In *United States v. James Bonet*, for example, the government recommended a 45-day term of imprisonment for a rioter who smoked marijuana inside Senator Merkley's office.  *See United States v. James Bonet*, 1:21-cr-00121 (EGS).  Judge Sullivan ultimately sentenced James Bonet to 90 days' imprisonment—twice the government's recommendation—in part because a television interview with the defendant on the one-year anniversary of the January 6 riot showed that the defendant lacked remorse for his actions.  Here, too, Petrosh has failed to demonstrate genuine remorse for his participation in the January 6 riot.  While he regrets stealing the microphones from Speaker Pelosi's lectern, he believes that his and other rioters' conduct was justified.  In fact, he believes, that any show of force (short of the use of firearms) would have been justified given how "they cheated on a f***ing election."

Finally, the government has routinely requested, and the courts have often imposed, sentences of incarceration in cases where defendants were at the front lines of violence with law enforcement officers.  *See, e.g.*, *United States v. Frank V. Scavo*, 1:21-cr-00254 (RCL) (defendant

---

[7] On March 17, 2022, defendant William Merry filed a consent motion to continue sentencing to April 11, 2022.

sentenced to 60 days' imprisonment after being at the front of the breach of the East Columbus doors); *United States v. Mark Simon*, 1:21-cr-00067 (ABJ) (defendant sentenced to 35 days' incarceration after participating in the breach of the East Columbus doors); *United States v. Russell James Peterson*, 1:21-cr-00309 (ABJ) (defendant sentenced to 30 days' imprisonment after being a couple feet away from rioters who violently shoved and pushed officers outside the Capitol building).

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighed and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently form how other district courts might have sentenced that defendant." *Id.* at 1095.

**V.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Robert Lee Petrosh to 120 days' imprisonment, one year of supervised release, 60 hours of community service, and $938 in restitution. Such a sentence protects the community, promotes respect for the

law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     */s/ Hava Mirell*
        HAVA MIRELL
        CA Bar No. 311098
        Assistant United States Attorney, Detailee
        U.S. Attorney's Office
        555 4th Street, N.W.
        Washington, D.C.  20530
        Office: 213-894-0717
        E-mail: Hava.Mirell@usdoj.gov